**UNITED STATES OF AMERICA,
Plaintiff - Appellee,
v.
JAMES LEWIS BRYANT, JR.,
Defendant - Appellant.**

No. 15-4618

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

Submitted: April 26, 2016
July 19, 2016

**UNPUBLISHED**

Appeal from the United States District Court for the Middle District of North Carolina, at Greensboro. James A. Beaty, Jr., Senior District Judge. (1:15-cr-00099-JAB-1)

Before KING, WYNN, and DIAZ, Circuit Judges.

Reversed, vacated, and remanded by unpublished opinion. Judge Diaz wrote the opinion, in which Judge King and Judge Wynn joined.

Benjamin D. Porter, MORROW PORTER VERMITSKY FOWLER & TAYLOR, PLLC, Winston-Salem, North Carolina, for Appellant. Ripley Rand, United States Attorney, Graham T. Green, Assistant United States Attorney, Winston-Salem, North Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

Page 2

DIAZ, Circuit Judge:

James Lewis Bryant, Jr., entered a conditional guilty plea to being a prohibited person in possession of a firearm, reserving the right to appeal the district court's denial of his motion to suppress evidence of a firearm recovered after a Terry[1] stop. He argues that the stop violated his Fourth Amendment rights because the police lacked reasonable suspicion that he was engaged in criminal activity. We agree and therefore reverse the district court's denial of Bryant's motion to suppress, vacate his conviction and sentence, and remand for further proceedings.

I.
A.

On September 4, 2014, the police in Winston-Salem, North Carolina, received an anonymous tip that ultimately led to the discovery of the evidence Bryant seeks to suppress. The tipster told the police to "check for" Bryant at Wingz & Spiritz, a restaurant/bar in downtown Winston-Salem, because Bryant had a gun inside a brown satchel. J.A. 25-26. In providing the police with this information, the tipster gave Bryant's full

Page 3

name and his date of birth. The tipster also described Bryant's appearance and said he was a felon.

Officer David Walsh was dispatched to Wingz & Spiritz, but before heading there, he researched Bryant on his computer. Walsh reviewed Bryant's mugshot, learned his height and weight, and confirmed that the tipster correctly relayed Bryant's full name and date of birth. Walsh also saw a "caution indicator[] . . . noting [Bryant] as a convicted felon, registered sex offender." J.A. 26.

Walsh then walked to Wingz & Spiritz where he found Bryant,[2] who matched the tipster's description in all respects except that he was wearing a silver backpack rather than a brown satchel. Initially, Walsh did not approach Bryant, opting instead to make small talk with a restaurant employee while observing Bryant's behavior for "his reaction to [Walsh] as a uniformed officer." J.A. 27.[3]



-1-

Eventually, Walsh approached Bryant and told him that somebody called the police on him. According to Walsh, Bryant then "seemed like he started to walk away" but then turned back,

Page 4

"sp[eaking] . . . in a low whisperish-type voice." J.A. 28. This tone of voice made Walsh "even more suspicious" because, in his experience, people who "have just been caught or are in trouble" will often become "really animated and shouting as kind of a distraction or sometimes . . . they'll lower their voice and talk real low in a whisper." J.A. 28.

Bryant then sat on a bench. Walsh observed that "when he sat down his right arm, he had it pinned to his body and he sat down real slow, kind of stunned." J.A. 28. Based on this and his interaction with Bryant so far, Walsh was left with the overall impression that "this guy is really nervous and I don't think he wants to be—I don't think he likes being around me." J.A. 28.

Walsh next told Bryant that the person who called the police on him reported that he might have a gun. Walsh asked Bryant if this report was true, to which Bryant responded, "No." J.A. 28. Next, Walsh said, "You're not supposed to have a gun, are you?" J.A. 28. Bryant agreed. Walsh then said that the caller told the police that Bryant's gun was inside his backpack, which Bryant denied.

Walsh next asked, "[C]an you open your backpack and show me you don't have a gun in there, please?" J.A. 29. Bryant then took his backpack off his shoulder, placed the backpack on the bench space next to him, and began reaching into the bag. In

Page 5

doing this, Bryant had his back toward Walsh. Walsh, fearful that he could be shot, said, "Don't put your hand in there. I'll do it for you." J.A. 30.

Walsh then took control of the bag, feeling "a centralized heavy weight" that was "similar to what a handgun would weigh." J.A. 30, 41. Bryant continued to deny that there was a gun inside of the bag, but ultimately Walsh recovered a revolver. Bryant was then arrested.

B.

Bryant was indicted for being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2). He moved to suppress evidence of the revolver, asserting a Fourth Amendment violation based on Florida v. J.L., 529 U.S. 266 (2000) (holding that an unreliable anonymous tip that someone was carrying a gun, without more, did not justify a Terry stop).[4]

The district court denied Bryant's motion. It found that Walsh had reasonable suspicion that Bryant was engaged in criminal activity, justifying Walsh's seizure of Bryant. The court based its conclusion on (1) the anonymous tip; (2) Walsh's

Page 6

corroboration of details given in the tip, including the fact that Bryant was a felon; and (3) Bryant's nervous behavior.

Bryant then entered a conditional guilty plea, preserving his right to challenge the district court's denial of his suppression motion. The court sentenced him to 21 months' imprisonment followed by three years of supervised release.

This appeal followed.

II.

The only issue on appeal is whether Walsh's seizure of Bryant was justified—that



is, whether Walsh violated the Fourth Amendment when he ordered Bryant to keep his hands out of his backpack. Thus, we evaluate this case under the familiar reasonable-suspicion standard articulated in Terry and its progeny.

On appeal from a denial of a suppression motion, "we review the district court's factual findings for clear error and its legal conclusions de novo." United States v. Green, 740 F.3d 275, 277 (4th Cir. 2014). As the government prevailed below, "[w]e construe the evidence in the light most favorable to [it]." Id.

A police officer may not conduct an investigatory stop of a person unless "the officer's action is supported by a reasonable and articulable suspicion . . . that criminal activity 'may be

Page 7

afoot.'" United States v. Bumpers, 705 F.3d 168, 171 (4th Cir. 2013) (quoting Terry, 392 U.S. at 30). That suspicion must be rooted in "a 'particularized and objective basis for suspecting the particular person stopped of criminal activity.'" United States v. Black, 707 F.3d 531, 539 (4th Cir. 2013) (quoting United States v. Griffin, 589 F.3d 148, 152 (4th Cir. 2009)).

To evaluate whether an officer had reasonable suspicion, courts look to "the totality of the circumstances." United States v. Slocumb, 804 F.3d 677, 682 (4th Cir. 2015). Seemingly innocent facts may, when viewed in aggregate, furnish reasonable suspicion. See id. "That said, we are skeptical of 'Government attempts to spin . . . largely mundane acts into a web of deception.'" United States v. Foster, No. 15-4319, 2016 WL 2996904, at *3 (4th Cir. May 24, 2016) (published opinion) (alteration in original) (quoting United States v. Foster, 634 F.3d 243, 248 (4th Cir. 2011)). Consequently, "the Government cannot rely upon post hoc rationalizations to validate those seizures that happen to turn up contraband." Id. (quoting Foster, 634 F.3d at 249).

The government points to three factors supporting Walsh's suspicion that Bryant was breaking the law:

> (1) the anonymous call reporting that Bryant had a firearm in his bag and giving particular details about Bryant, and Walsh's confirmation of the accuracy of some of those details;

Page 8

> (2) Bryant's criminal record; and

> (3) Bryant's nervous behavior when confronted by Walsh with the information that someone reported him to the police.

Reviewing these factors together, we conclude that Walsh lacked reasonable suspicion that Bryant was engaged in criminal activity.

The first factor—the anonymous tip and Walsh's research confirming some of the details given by the caller—is the most important, as the tip was the impetus for Walsh confronting Bryant and the most direct evidence supporting Walsh's suspicion that Bryant was armed. While an anonymous tip, by itself, cannot justify a Terry stop, see United States v. Elston, 479 F.3d 314, 317 (4th Cir. 2007), the police may rely on such a tip if it is "suitably corroborated, exhibit[ing] 'sufficient indicia of reliability,'" J.L., 529 U.S. at 270 (quoting Alabama v. White, 496 U.S. 325, 327 (1990)).

The parties do not dispute that the tip, taken alone, was insufficient to establish reasonable suspicion. They argue, however, whether this case is akin to J.L., where a stop



was not justified based on an anonymous tip, or Alabama v. White, where an anonymous tip supported a finding of reasonable suspicion.

In White, an anonymous tipster told the police that a Vanessa White would leave a particular apartment at a particular time in a particular car to travel to Dobey's Motel with an

Page 9

ounce of cocaine in an attaché case. 496 U.S. at 327. The police went to the apartment specified by the caller and, "within the timeframe predicted by the caller," saw a woman walk into the car that the tipster had described and drive on the "most direct route to Dobey's Motel." Id. at 327, 331. The police stopped the car and ultimately recovered drugs. Id. at 327.

The Court concluded that, although it was a "close case," the stop was legal because it was reasonable for the police to rely on the tip after corroborating "significant aspects of the informer's predictions." Id. at 331-32. The Court was careful, however, to distinguish between "details [given by a tipster] relating . . . to easily obtained facts and conditions existing at the time of the tip" and "future actions of third parties ordinarily not easily predicted." Id. at 332 (quoting Illinois v. Gates, 462 U.S. 213, 245 (1983)). The former are of little value because anyone can observe and report unremarkable conditions existing at the time of a call, such as the color and location of White's car. See id. In contrast, the latter type of detail (a prediction of future actions) increases the reliability of a tip by "demonstrat[ing] inside information—a special familiarity with [the suspect's] affairs." Id. Accordingly, the Court determined that because the anonymous caller was privy to White's itinerary, it was reasonable to

Page 10

think that the caller "also ha[d] access to reliable information about [White's] illegal activities." Id.

In J.L., an anonymous tipster reported that "a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun." 529 U.S. at 268. Police officers arrived at the scene and found J.L., who matched the description in the tip, along with two other people. Id. The police then stopped and frisked J.L. even though they "had no [other] reason to suspect [J.L. or his two companions] of illegal conduct" and they "did not see a firearm, and J.L. made no threatening or otherwise unusual movements." Id.

The Supreme Court concluded that the police lacked reasonable suspicion to support a Terry stop. Id. The Court rejected the government's argument that "the tip was reliable because its description of the suspect's visible attributes proved accurate." Id. at 271. The Court reasoned that while "[a]n accurate description of a subject's readily observable location and appearance" is reliable in the sense that "[i]t will help the police correctly identify the person whom the tipster means to accuse," such a description does not demonstrate that "the tipster has knowledge of concealed criminal activity." Id. at 272. This was critical, the Court explained, because reasonable suspicion "requires that a tip be

Page 11

reliable in its assertion of illegality, not just its tendency to identify a determinate person." See id. (emphasis added).

The tip in the instant case is far more like the one in J.L. than the one in White and therefore deserves little weight in our reasonable-suspicion calculus. While the tipster here provided more detail than the tipster in J.L. (namely, Bryant's name, birthday, age, and status as a felon), these



-4-

details merely "identify a determinate person" rather than demonstrate the reliability of the tipster's "assertion of illegality." Id. Indeed, similar to J.L., nothing supported the tipster's assertion of illegality beyond his or her bald statement that Bryant was carrying a gun inside of his bag.[5]

Moreover, the details that the tipster provided in this case were less impressive than those given in White. The trivia that the tipster recited about Bryant are available on the internet, as Bryant is a registered sex offender. Thus, they are a weak indicator of the caller's access to "inside information," especially in comparison to the predictions of future behavior made by the tipster in White. See White, 496

Page 12

U.S. at 332 ("The general public would have had no way of knowing that [White] would shortly leave the building, get in the described car, and drive the most direct route to Dobey's Motel.").

The second factor to which the government points—the fact that Bryant had a felony conviction—does not significantly bolster the case for reasonable suspicion. A person's criminal record, standing alone, cannot justify a stop, although it can support a finding of reasonable suspicion when accompanied by more "concrete" indications of criminal activity. See United States v. Sprinkle, 106 F.3d 613, 617 (4th Cir. 1997). Here, there are no concrete indications that Bryant was engaging in criminal activity. Furthermore, Walsh learned that Bryant's felon status was based on a prior sex offense, a conviction that does little to suggest that he was carrying a gun on the day in question.

Finally, the third factor upon which the government relies—Bryant's nervous behavior—does not tip the balance in the government's favor. While a suspect's evasiveness and nervousness are relevant in a reasonable-suspicion inquiry, see United States v. Massenburg, 654 F.3d 480, 490 (4th Cir. 2011), "mild nervousness" is to be expected during a police-citizen interaction and does little to support reasonable suspicion, see id. at 488-91 (explaining that an unreliable anonymous tip

Page 13

coupled with mild signs of nervousness failed to justify a Terry stop); see also Slocumb, 804 F.3d at 683 ("We have cautioned that 'it is important not to overplay a suspect's nervous behavior in situations where citizens would normally be expected to be upset.'" (quoting United States v. Glover, 662 F.3d 694, 699 (4th Cir. 2011))).

Five aspects of Bryant's behavior are relevant to whether he appeared unusually nervous, specifically (1) Bryant "seemed like he started to walk away" when Walsh approached him, (2) Bryant spoke in a "low whisperish-type voice" and did not consistently make eye contact; (3) when Bryant sat down, he had his right arm "pinned to his body"; (4) Bryant sat down slowly and seemed "kind of stunned"; and (5) when Bryant took off his backpack and opened it, he turned to the side, causing his back to face Walsh. J.A. 27-29. Based on this evidence and after viewing the body-camera footage, the district court concluded that Bryant "was acting nervous and avoiding eye contact and any interaction with Officer Walsh."[6] J.A. 62.

Page 14

Though Bryant may have exhibited some nervousness, it was nothing more than the garden-variety nervousness that often results from a police-citizen interaction—especially one in which the officer tells the citizen that he was reported to the police. First, while Bryant may have "seemed like he started to walk away," citizens are free to refuse to cooperate with the police before a seizure. See



Illinois v. Wardlow, 528 U.S. 119, 125 (2000). Moreover, although we have found reasonable suspicion based on unusually evasive behavior like quickly walking away from police officers, see Slocumb, 804 F.3d at 683 (discussing cases), we cannot conclude that "seem[ing] like . . . start[ing] to walk away" is particularly suspicious, especially considering Bryant made no attempt to leave the scene when Walsh arrived at Wingz & Spiritz, see Sprinkle, 106 F.3d at 618-19 (concluding that there was no reasonable suspicion where, among other factors, the defendant attempted to conceal his face and drove away "in a normal, unhurried manner").

Second, while Bryant's mumbling and lack of eye contact may be consistent with nervousness, they are not the sort of "unusually nervous behavior[s]" that furnish reasonable suspicion. See Massenburg, 654 F.3d at 490 (quoting United States v. Mayo, 361 F.3d 802, 806 (4th Cir. 2004); see also Foster, 2016 WL 2996904, at *5-7 (explaining that a defendant's unresponsiveness and lack of eye contact—even when coupled with

Page 15

an anonymous tip reporting a gunshot and the fact that the defendant was the only person that the police encountered in the area where the shot was reported—were insufficient to establish reasonable suspicion); Slocumb, 804 F.3d at 682-84 (concluding that a defendant's lack of eye contact and "low, mumbled responses," among other factors, did not give rise to reasonable suspicion). Bryant responded to Walsh's questions and was cooperative. Additionally, while Bryant at times looked away from Walsh, he did not avoid eye contact throughout the entire interaction. Fourth Amendment protections do not turn on faultless elocution or the outcome of staring contests. Only those among us with ice water in our veins would fail to exhibit mild signs of nervousness when confronted by a police officer, especially when the officer says that "somebody called the police on you." J.A. 27.

Third, we fail to see how the fact that Bryant's arm was pinned to his body is indicative of nervousness or suspiciousness. Thus, we give this fact no weight in our analysis. See Massenburg, 654 F.3d at 482 (cautioning against crediting efforts by the government to use "whatever facts are present, no matter how innocent, as indicia of suspicious activity" (quoting Foster, 634 F.3d at 248)).

Fourth, although Bryant sat down slowly, "kind of stunned," J.A. 28, this reaction was also not unusual considering Walsh

Page 16

just told him that somebody reported him to the police. See, e.g., Massenburg, 654 F.3d at 490 (distinguishing unremarkable nervousness during a police interaction from "unusually nervous behavior" like breathing heavily, having shaky hands, and giving inconsistent answers (quoting Mayo, 361 F.3d at 806)).

Fifth, the fact that Bryant turned his back to Walsh when he complied with Walsh's request to open his backpack does not strongly indicate nervousness or evasiveness, if at all. Bryant was seated on the edge of a bench and, when he opened his bag, he used the empty part of the bench next to him as a surface. That this happened to cause Bryant to turn his back to Walsh is of little moment.

In sum, viewing all of the facts together, we conclude that the stop of Bryant was not justified by reasonable suspicion of criminal activity. An unreliable tip, mild signs of nervousness, and a prior conviction for an offense unrelated to the one being investigated are simply not enough to permit a Terry stop. Compare id. at 484-91 (finding no reasonable suspicion based on an



anonymous tip reporting a gunshot, mild nervousness, and the fact that the defendant and his companions were the only people found within the vicinity of the reported shot shortly after the police received the tip), with Foster, 2016 WL 2996904, at *7-9 (finding that the defendant's suspicious "security check"—an instinctual movement in which a

Page 17

suspect reaches to ensure that a concealed weapon is secure-tipped the reasonable-suspicion balance in the government's favor where the police also relied on, among other things, an anonymous tip reporting a gunshot, the defendant's presence in the area reported, and the defendant's unresponsiveness and lack of eye contact).

III.

For the reasons given, we reverse the district court's denial of Bryant's motion to suppress, vacate his conviction and sentence, and remand for further proceedings. We direct the Clerk to issue the mandate forthwith.

REVERSED, VACATED, AND REMANDED

--------

Footnotes:

[1.] Terry v. Ohio, 392 U.S. 1 (1968).

[2.] All of Walsh's actions from this point forth were recorded on his body camera.

[3.] While the district court said that "Officer Walsh stated that he felt [Bryant] was acting nervous during this time," J.A. 53, we do not find such testimony in the record.

[4.] Bryant maintained that he did not consent to a search and that his interaction with Walsh was no longer consensual when Walsh ordered him to keep his hands out of his bag. The district court agreed, and the government does not challenge this finding on appeal.

[5.] This distinguishes the instant case from Navarette v. California, 134 S. Ct. 1683, 1688-89 (2014) (explaining that a tip reporting dangerous driving was reliable because the tipster's information was based on witnessing the dangerous driving firsthand, unlike in J.L., "where the tip provided no basis for concluding that the tipster had actually seen the gun").

[6.] We take no issue with the district court's finding that Bryant exhibited signs of nervousness and, at least to some extent, avoided eye contact. But, the court committed clear error in finding that Bryant avoided "any interaction" with Walsh, J.A. 62 (emphasis added), as Bryant did not leave the scene, responded to Walsh's questions, and complied with Walsh's requests.

--------

