IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

_____x
                              :
UNITED STATES OF AMERICA,      :        Criminal Action
                              :
            Plaintiff,         :        No.  2:18-cr-00215
                              :
v.                            :
                              :        Date:  March 5, 2019
JAY JAMES FIELDS,              :
                              :
            Defendant.         :
_____x


TRANSCRIPT OF PRETRIAL MOTIONS HEARING HELD
BEFORE THE HONORABLE DAVID A. FABER, JUDGE
UNITED STATES DISTRICT COURT
IN CHARLESTON, WEST VIRGINIA

APPEARANCES:

For the Government:         AUSA CHRISTOPHER R. ARTHUR
                            U.S. Attorney's Office
                            P.O. Box 1713
                            Charleston, WV  25326-1713


For the Defendant:          ANDREW J. KATZ, ESQ.
                            The Katz Working Families Law
                            Firm
                            Suite 1106 Security Building
                            100 Capitol Street
                            Charleston, WV 25301




Court Reporter:             Ayme Cochran, RMR, CRR

Proceedings recorded by mechanical stenography;
transcript produced by computer.

**INDEX**

| GOVERNMENT WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS | EXAMINATION |
|---|---|---|---|---|---|
| J. Sparks | 11 | | | | |
| J. Wimmer | 21 | 29 | | | |
| Z. Lilly | 30 | 44 | | | |

| DEFENSE WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS | EXAMINATION |
|---|---|---|---|---|---|
| None | | | | | |

| GOVERNMENT EXHIBITS | ADMITTED |
|---|---|
| 1 | 16 |
| 2 | 28 |

| DEFENSE EXHIBITS | ADMITTED |
|---|---|
| None | |

1          PROCEEDINGS had before The Honorable David A. Faber,

2     Judge, United States District Court, Southern District of

3     West Virginia, in Charleston, West Virginia, on March 5,

4     2019, at 2:52 p.m., as follows:

5               THE COURT:  Before the Court this afternoon is the

6     United States against James Jay Fields.  The matter is

7     pending upon the defendant's Motion to Suppress, which I

8     have set for hearing today.

9          Please note your appearances.

10              MR. ARTHUR:  Yes, Your Honor.  Chris Arthur on

11    behalf of the United States.

12         In addition, Your Honor, we had to start late.  My

13    agent is running a little late now.  Is it okay if he comes

14    in even after the hearing starts?

15              THE COURT:  That will be fine.

16              MR. ARTHUR:  I just wanted to let the court know.

17              THE COURT:  Okay.

18              MR. KATZ:  Yes, Your Honor.  Andy Katz, for the

19    record, on behalf of the defendant, who is here in person.

20              THE COURT:  Okay.  It's your motion, Mr. Katz.

21    You may proceed.

22              MR. KATZ:  Okay.  Your Honor, I know you've had

23    many, many motions to suppress and so, I'll just be brief on

24    what the legal standard is.  As is well known, they call it

25    "the totality of the circumstances", Your Honor, all of the

circumstances involved. And so, there -- and, actually, the court has mentioned that there's two separate issues. One is whether there was a stop and what kind of stop there is and then, second, is whether the invasiveness of the stop was based on proper circumstances.

And so, here, Your Honor, and this is one of the first disputes, is that we do contend that there was a stop and -- well, let me backtrack for a second, Your Honor. Everybody would say there was a stop. It depends on when the stop actually happened. Here is what we contend happened, Your Honor, and I think mostly the facts aren't too much in dispute.

But there was a 911 call that went out to dispatch. The 911 dispatcher asked for someone in the -- like the Greenville Road area in Logan County and mentioning that there were two suspicious people. They gave a bit of a description of what they were wearing. They used a code, and I forget the exact number, what the code was, but I believe it indicated that -- or it was a suspicion that they had left a house that was thought to be associated with drug use.

THE COURT: Thought to be associated with drug users by the caller, or by the law enforcement officers, or by both?

MR. KATZ: You know, that's a good point. I think

1    it was the caller that said that, Your Honor, that --

2           THE COURT:  Was the caller ever identified, Mr.

3    Katz?

4           MR. KATZ:  He did identify himself during the

5    call.  However, importantly, the dispatcher did not identify

6    the caller to the -- when he made the call for -- I won't

7    say assistance -- but for a response.

8           THE COURT:  So, when he called the police, he just

9    said he got a call and didn't say who it was or whether he

10   knew him or anything, right?

11          MR. KATZ:  Yes, sir.  That is right.  And so --

12          THE COURT:  So, there wasn't any basis at all, in

13   your view, to -- for the authorities to judge the

14   credibility of the caller?

15          MR. KATZ:  Obviously, honesty compels me to say,

16   no, Your Honor, I would not say there was no ground, no fact

17   at all, but what you -- once you look at what the deputy

18   knew in light of what the case law is from the Fourth

19   Circuit, it was not nearly enough to constitute a reasonable

20   suspicion, an articulable factual-based belief suspicion

21   that this individual person was either about ready to or had

22   committed a crime and we believe that, no, that there wasn't

23   sufficient indication of that to justify a stop.

24       And so, what happened, Your Honor, is that law

25   enforcement vehicle was, you know, going down -- I'm just

going to assume, but I don't know for sure, they were on Greenville Road and the important point, though, is that they passed the couple, Mr. Fields and his girlfriend, and then made a stop, you know, they stopped and then he parked essentially, got out of his vehicle, and then walked towards them.

And then, again, another important factual determinate here based on the case law is then he asked him or ordered him really to go stand near his vehicle.  When Mr. Fields hesitated, the deputy repeated the command to go stand towards the vehicle.

Now, there's a couple of things, why I mentioned those things in particular; for instance, the vehicle coming back and stopping.  The *Jones* case, *U. S. v. Jones*, which is actually cited in the government's brief, talked about how important it was to determine whether or not the person who would eventually be arrested, eventually become the defendant, whether that person at the time of the stop would feel he or she was being singled out, as opposed to this is just a routine act of law enforcement.  There is no particular, you know, "I suspect you of a crime."  It's a routine questioning, a routine stop.

In fact, what *Jones* says, "The authority to initiate a conversation is no greater than the average citizen."  So that's, you know, is what you can liken it to when this is a

conversation.  And this is all taken from the *Jones* case

cited by the government, then there's not a stop.

However, when there's a -- when there's a

particularized view that these people -- that I want to

talk, that's an important factor that leads to the

conclusion that it's a stop.

The other thing was if the person directs -- directs

that person to a location, that's another important thing,

which is why I mentioned that the deputy told him to go over

by the car because that's an indicia that you're not free to

leave.  He's telling you where to go and a very important

thing, too, Your Honor, is when Mr. Fields hesitated and

that order was repeated, that's again an indicia that you're

not free to sit there and stop.  You're not free to leave.

The second time he says it is a further indication that he's

not free to go.  He is being told by law enforcement where

to stand in order to be questioned.

Cases on point on that, you know, there's a case,

*Johnson v. Campbell*, which *was actually cited in the Jones*

case.  That was actually a 1981 case.  The cite was 322 F.3d

199.  It's from the Third Circuit.  It's not a Fourth

Circuit cases.  And it's a 1983 case.  But the importance

there, in that case, Your Honor, an individual that the law

enforcement officer assumed might have been committing a

crime, he was actually a 45-year-old African American

1    basketball coach.  The officer there told him to roll down

2    the window so he could talk to him.  The defendant refused.

3    He did not roll down the window.  The guy repeated, the law

4    enforcement repeated, "Roll down the window."  And what this

5    court in the Third Circuit said was that repetition of the

6    command indicates that you're not free to ignore me and go

7    on your way.  I'm telling you to roll down the window.  And

8    that command, that use of your authority, the law

9    enforcement's authority, is what was considered a stop in

10   that case.

11        And, again, it was a 1983 case, but part of a

12   plaintiff's case in a 1983 is to show that there was a

13   constitutional violation.  And so, that's what their

14   argument was, that they violated his Fourth Amendment and

15   the Third Circuit agreed with that.

16        So -- so we have several factors here that courts have

17   recognized lead to a stop that Mr. Fields would have felt

18   that he was being singled out by a law enforcement official

19   and he was being told where to stand, and so, that makes a

20   stop.  And there was no reason of suspicion for the stop

21   because the only thing -- they didn't know a description

22   but, again, if you look at some of the cases that we cited

23   in our brief, just the -- and also, you know, in the U. S.

24   Supreme Court that *JL* case where they said, you know,

25   there's an African American, and they said what the guy was

1  wearing, and he's standing by a bridge, or something to that

2  effect.  The law enforcement officer there approached him

3  and the *JL* court said that's not enough.

4      We had a very similar circumstance at the Fourth

5  Circuit, the *Brown* case, which I also mentioned.  Very

6  similar.  They gave an accurate physical description, but

7  there was nothing in that physical description to prove

8  anything more than this guy is this guy, but the suspicion

9  must be not that I can identify who this is; the suspicion

10  is that this guy is engaging in some sort of criminal

11  activity.  The famous phrase is that "criminal activity is

12  afoot", is the famous phrase from *Terry* that you see in so

13  many different cases.

14      So, Your Honor, we do believe there was a stop and we

15  do believe there was not reasonable suspicion for the stop.

16  Therefore --

17          THE COURT:  Well, suppose you lose on that point,

18  what -- what's your argument about the rest of it?

19          MR. KATZ:  Your Honor, I did put in the brief that

20  --

21          THE COURT:  Your client pretty much gave himself

22  up by the way he acted, didn't he?

23          MR. KATZ:  After he -- after he committed flight

24  and, as I said in the brief, there's no per se rule that

25  flight equals reasonable suspicion and the two cases that I

1    cited that had flight -- plus, it wasn't a very -- it was in

2    a very dangerous crime-infested area.  Interestingly enough

3    -- well, never mind.  It's not relevant to what I was going

4    to say.

5         So, but, you know, honestly, Your Honor, I don't

6    consider that our stronger argument, that even after the

7    flight, they still didn't have reasonable suspicion.  I do

8    maintain that that's true, but I believe our stronger

9    argument was the one that I presented before.

10                 THE COURT:  Okay.  Mr. Arthur?

11                 MR. ARTHUR:  Yes, Your Honor.

12                 THE COURT:  Do you want to put on any evidence?

13   All I've got are the representations that are in the briefs

14   here.

15                 MR. ARTHUR:  Yes, Your Honor.  I have witnesses

16   that I would like to call.

17                 THE COURT:  I would rather hear the evidence

18   first, Mr. Arthur, and then I'll hear your argument.

19                 MR. ARTHUR:  Yes, Your Honor.  The United States

20   would like to call Jamie Sparks first.

21                 THE COURT:  Okay.

22                 COURTROOM DEPUTY CLERK:  Would you please state

23   your full name?

24                 THE WITNESS:  Jamie Eugene Sparks.

25                 COURTROOM DEPUTY CLERK:  Eugene?

1           THE WITNESS:  Eugene, yes, ma'am.

2           COURTROOM DEPUTY CLERK:  Please raise your right

3    hand.

4        **JAMIE EUGENE SPARKS, GOVERNMENT WITNESS, SWORN**

5           COURTROOM DEPUTY CLERK:  Thank you.  Please take a

6                             seat.

7                     **DIRECT EXAMINATION**

8           **BY MR. ARTHUR:**

9    **Q.**   Good afternoon, Mr. Sparks.  Please state your full

10   name for the record.

11   **A.**   Jamie Eugene Sparks.

12   **Q.**   Where are you employed at, sir?

13   **A.**   Logan County 911.

14   **Q.**   How long have you been employed there?

15   **A.**   I've worked there for about 14 years.  And then I went

16   to work on the railroad and I came back.  I've been back

17   there for two years now.

18   **Q.**   What are your primary job responsibilities?

19   **A.**   Dispatching police, fire and ambulance, call taking.

20   **Q.**   When someone calls 911, how does that call end up with

21   you?

22   **A.**   Comes -- it just comes straight to a caller, a call

23   taker.

24   **Q.**   Is the call recorded?

25   **A.**   Yes, sir.

1    **Q.**   Do you have to do anything personally to make the call

2    be recorded?

3    **A.**   No, sir.

4    **Q.**   Do you document the call in any other way?

5    **A.**   No.

6    **Q.**   Are the audio calls stored as part of 911's regular

7    course of business?

8    **A.**   Yes, sir.

9    **Q.**   What do you do if a call comes in that requires some

10   type of law enforcement assistance?

11   **A.**   I put out central available unit for a call.

12   **Q.**   And if that happens, how is that call relayed to law

13   enforcement?

14   **A.**   When I get the call, we give him the information, and

15   he proceeds to go on the call.

16   **Q.**   Going back to the audio being recorded, how is that

17   stored at 911?

18   **A.**   Years ago, when I first worked there, it was stored on

19   a tape.  It's like the old movie-type tapes.  Now, they've

20   went to like an audio, like a database they put it on, like

21   a jump drive now.

22   **Q.**   And how long are those audios kept?

23   **A.**   365, the old tapes was.  I think it is all now put into

24   the database that we have at the 911 Center and they keep

25   it, as far as I know, 365 days.

1    **Q.**   And where are those stored at the 911 facility?

2    **A.**   We have, in a back room, a computer room we store them

3    in.  It's on a --

4    **Q.**   Were you employed in November, November 3rd, 2017, with

5    911?

6    **A.**   Yes, sir.

7    **Q.**   Do you know if you worked that particular day,

8    November 3rd, 2018?

9    **A.**   Yes, sir, I did.

10   **Q.**   Now, that was almost a year and a half ago.  How do you

11   recall --

12             THE COURT:  Was it 2018 or 2017?

13             MR. ARTHUR:  Oh, 2017.  I apologize.  Yes.

14   November 3rd, 2017.

15             THE WITNESS:  Yes, sir.

16             BY MR. ARTHUR:

17   **Q.**   And did you -- do you know if you worked that day?

18   **A.**   Yes, sir, I did.

19   **Q.**   What is your shift typically with 911?

20   **A.**   It's usually an eight-hour shift or a 12-hour shift.

21   The day shift, we work from 7:00 a.m. to 7:00 p.m.; or an

22   eight-hour shift from 3:00 to 11:00.

23   **Q.**   Did you have a chance to determine what hours you

24   worked that particular day?

25   **A.**   No, sir, I didn't, but I do know I worked that day.  I

1    think it was 3:00 to 11:00.

2    **Q.**   How do you know you worked that particular day?

3    **A.**   On a schedule.

4    **Q.**   Do you recall any specific calls from that day?

5    **A.**   Yes, sir.

6    **Q.**   So, that was a little over a year ago.  What call do

7    you recall from that specific day?

8    **A.**   There was a call for that area.  We put it out like --

9    we said "Central -- Logan County 911".  We call it "Radio

10   Central".  That day, I remember the call of a welfare check/

11   suspicious person in the Greenville Road area.

12   **Q.**   Are there any audios from that call, do you know, sir?

13   **A.**   As far as --

14             THE COURT:  What do you mean by a "welfare check"?

15             THE WITNESS:  A welfare check is like checking on

16   a person.  A welfare check -- say, for example, like elderly

17   people or something are home alone.

18             THE COURT:  Got you.

19             THE WITNESS:  And that's how we put it out.

20   Welfare check or suspicious person, that's how we put in our

21   call time.

22             THE COURT:  I understand.  Thank you.

23             THE WITNESS:  Yes, sir.

24             BY MR. ARTHUR:

25   **Q.**   Do you know if there were any audio recordings from

1    that day?

2    **A.**    Yes, sir.

3            MR. ARTHUR:  Your Honor, may I approach?

4            THE COURT:  Yes, you may.

5            MR. ARTHUR:  Let the record show that I am showing

6    defense counsel a disc.

7            BY MR. ARTHUR:

8    **Q.**    Have you had an opportunity, sir, to review that disc?

9    **A.**    Yes, sir.

10   **Q.**    Prior to this hearing?

11   **A.**    Yes, sir, I have.

12   **Q.**    Is there anything on that disc that would allow you to

13   know that you've identified that disc?

14   **A.**    Yes.  My initials and the dates.

15   **Q.**    So, you initialed that?

16   **A.**    Yes, sir, I did.

17   **Q.**    And you had a chance to watch whatever or listen to

18   whatever is on that disc?

19   **A.**    Yes, sir, I did.

20           THE COURT:  Does it accurately reflect what

21   actually happened?

22           THE WITNESS:  Yes, sir, it did.

23           THE COURT:  Okay.

24           BY MR. ARTHUR:

25   **Q.**    Before I play this, sir, can you briefly describe

1    what's the content of that disc?

2              THE COURT:  Did you mark that as an exhibit?

3              MR. ARTHUR:  Oh, yes, Your Honor.  I forgot.  I

4    would like to have that marked as Government Exhibit 1.

5              THE COURT:  That's Government 1 for purposes of

6    this hearing.

7         Is there any objection to me admitting it, Mr. Katz?

8              MR. KATZ:  No, Your Honor.

9              THE COURT:  It's admitted.

10                   **GOVERNMENT EXHIBIT 1 ADMITTED**

11             BY MR. ARTHUR:

12   **Q.**   Please describe what is the content of that disc, sir.

13   **A.**   The content of that audio on it is a gentleman called

14   in from the Greenville Road area in the vicinity of 671, if

15   you listen to the tape, that stated that there was an

16   individual that was packing a Bowie knife as long as his leg

17   and a pistol.

18   **Q.**   Sir, I'm going to have that call played.  Just give it

19   a second.

20   **A.**   Yes, sir.

21        (Recording played in open court)

22             BY MR. ARTHUR:

23   **Q.**   Sir, do you recognize your voice on that audio?

24   **A.**   Yes, sir, I do.

25   **Q.**   And what day do you know that call occurred?

1    **A.**    3/5/17 -- no.  It was that --

2    **Q.**    Was it November 3rd, 2017?

3    **A.**    Yes.  Yes, sir.

4    **Q.**    The caller mentioned an area of Greenville?

5    **A.**    Uh-huh.

6    **Q.**    Where is that located at?

7    **A.**    It's a little subdivision of Man, outside of Man.

8    **Q.**    Is that in Logan County, West Virginia?

9    **A.**    Yes, sir, it is.

10   **Q.**    And that would also be an area that 911 would handle,

11   correct?

12   **A.**    Yes, sir.  We take police, fire and ambulance calls in

13   that area.

14   **Q.**    After you got that call, what did you do next?

15   **A.**    I put out "Central, any unit available for a call,

16   Greenville Road."

17   **Q.**    When you say "Central", can you explain what that

18   means?

19   **A.**    That's what we call our 911 center.  That's how we get

20   in contact with our radio units when we radio someone.

21   **Q.**    One thing the caller mentioned was a known drug house?

22   **A.**    Uh-huh.

23   **Q.**    Is that correct, that's what was mentioned?

24   **A.**    Yes, sir, it was.

25   **Q.**    Now, how do you relay that to law enforcement?

1    A.   Just put -- on that particular call, we just put it

2    out, "A signal 24 activity."

3    Q.   When you refer to "signal 24", what does that mean?

4    A.   For Logan County, that's a code for drug use, or

5    possible drugs on them.

6    Q.   So --

7              THE COURT:  Did you have any reason to believe

8    that was a drug house other than what this guy told you?

9              THE WITNESS:  No.  I just take calls.  I mean, I

10   take the 911 calls.  We do have activity in that area, drug

11   activity from that area of Greenville Road, but there's

12   other places throughout the county that's known for drug

13   activity.

14             THE COURT:  Did you know at the time you took the

15   call that there was drug activity on Greenville Road?

16             THE WITNESS:  No, sir, I did not, not until I took

17   that initial call.

18             THE COURT:  Did you have any idea who it was that

19   called you?

20             THE WITNESS:  No, sir.  I don't even know him.

21             THE COURT:  Go ahead.

22             BY MR. ARTHUR:

23   Q.   You relayed to law enforcement signal 24.  I'm going to

24   have my paralegal ply an audiotape for you to hear.

25   A.   Yes, sir.

1          (Recording played in open court)

2              BY MR. ARTHUR:

3    **Q.**   What does "19" mean in that audio?

4    **A.**   That's a Logan County Sheriff's Office unit.

5    **Q.**   So, is that a deputy from the Logan County Sheriff's

6    Office?

7    **A.**   Yes, sir, it is.

8    **Q.**   And you stated, "Just left residence known for signal

9    24 activity."  Again, "signal 24", it relates to some type

10   of drug activity?

11   **A.**   Yes, sir.

12   **Q.**   Could that include selling or possessing?

13   **A.**   Either selling or possessing.

14   **Q.**   Where is Greenville Road?

15   **A.**   Just outside of Man.

16   **Q.**   And what is "671 Greenville"?

17   **A.**   That is a physical address that's been given through

18   the Logan County 911 address.

19   **Q.**   The caller from earlier referenced a gun and a knife.

20   Was that relayed to law enforcement?

21   **A.**   No.

22   **Q.**   Can you explain, sir, why not?

23   **A.**   Because we was really busy, and I know that is

24   pertinent information, but I did not give it to him.  I've

25   had to live with that.

1          MR. ARTHUR:  Your Honor, the United States moves

2    that Exhibit 1 for admission as evidence.

3          THE COURT:  Is -- are both recordings on 1

4    Government, 1?

5          MR. ARTHUR:  Yes, Your Honor.

6          THE COURT:  Do you have any objection, Mr. Katz?

7          MR. KATZ:  No, sir.

8          THE COURT:  Government 1, I think I already

9    admitted it, but I will admit it again.

10         MR. ARTHUR:  Your Honor, the United States has no

11   further questions for this particular witness.

12         THE COURT:  Do you want to cross examine him, Mr.

13   Katz?

14         MR. KATZ:  No, sir.  No questions.

15         THE COURT:  All right.  Mr. Sparks, thank you,

16   sir, very much.  You can step down.  I appreciate you coming

17   all the way up here today.  Thank you.

18         THE WITNESS:  Thank you, sir.

19         MR. ARTHUR:  Yes.  The United States would like to

20   call Mr. Joseph Wimmer.

21         THE COURT:  Okay.

22         COURTROOM DEPUTY CLERK:  Would you please state

23   your full name?

24         THE COURT:  Just right here in front of it.

25         THE WITNESS:  Joseph Wayne Wimmer.

 1                COURTROOM DEPUTY CLERK:  Did you say Wayne?  How

 2      do you spell that?

 3                THE WITNESS:  W-a-y-n-e.

 4                COURTROOM DEPUTY CLERK:  And your last name?

 5                THE WITNESS:  W-i-m-m-e-r.

 6                COURTROOM DEPUTY CLERK:  Thank you.  Please raise

 7      your right hand.

 8           **JOSEPH WAYNE WIMMER, GOVERNMENT WITNESS, SWORN**

 9                COURTROOM DEPUTY CLERK:  Thank you.  Please take a

10      seat.

11                          **DIRECT EXAMINATION**

12                **BY MR. ARTHUR:**

13      **Q.**   Good afternoon, sir.  Please state your name for the

14      record.

15      **A.**   Joseph Wayne Wimmer.

16      **Q.**   Where are you employed at?

17      **A.**   Logan County Fire Department in Logan County.

18      **Q.**   And where is the fire department exactly located at?

19      **A.**   At the end of Greenville Road there by Man High School.

20      **Q.**   How long have you worked there?

21      **A.**   Since 2007.

22      **Q.**   What is your title right now with the fire department?

23      **A.**   I'm Fire Chief.

24      **Q.**   And when were you promoted to being Fire Chief?

25      **A.**   2012.

1    **Q.**   Do you know if you worked on November 3rd, 2017?

2    **A.**   I was at home that day.

3    **Q.**   Did you have any reason to go to the fire department

4    that particular day?

5    **A.**   Yes.

6    **Q.**   Does the fire department have any video surveillance

7    cameras?

8    **A.**   Yes.

9    **Q.**   Are the cameras that were up in 2017 similar to the

10   cameras that are up today?

11   **A.**   Yes.

12   **Q.**   Can you describe the equipment that was used on

13   November 3rd, 2017?

14   **A.**   The equipment used?

15   **Q.**   Yes, sir.

16   **A.**   How do you mean?

17   **Q.**   What type of surveillance cameras were used at the fire

18   department?

19   **A.**   I don't know the brand, but I have a -- I think it's 15

20   camera systems I think we have.  Nine cameras on that

21   system.

22   **Q.**   And where are the cameras located?

23   **A.**   Throughout the outside of the building.

24   **Q.**   And --

25   **A.**   Well, we have some inside, as well.

1  **Q.**   And how many cameras are on the outside of the

2  building?

3  **A.**   I believe five.

4  **Q.**   And, in 2017, would that still be the case, five

5  cameras on the outside?

6  **A.**   That's correct.

7  **Q.**   How often were those cameras checked in that time

8  frame, in the 2017 period, around November?

9  **A.**   I usually check them twice a day.

10  **Q.**   And how would you check them?

11  **A.**   It's on wifi.  I can check with my phone.

12  **Q.**   How long are your recordings stored at the fire

13  department?

14  **A.**   The cameras' hard drive?

15  **Q.**   Are the videos maintained as part of the regular course

16  of business with the fire department?

17  **A.**   Are they maintained?

18  **Q.**   Yes, sir.

19  **A.**   Yes.  Like just me viewing them, yes.

20  **Q.**   How long are they kept, any recordings?

21  **A.**   They record over themselves in approximately two days

22  average.

23  **Q.**   Are the recordings -- do they happen around the clock?

24  **A.**   Yes.

25  **Q.**   Is that every day?

1    **A.**    Yes.

2    **Q.**    Based on your experience as Fire Chief, especially in

3    that period, did the cameras function properly?

4    **A.**    Yes.

5    **Q.**    Did law enforcement request surveillance videotapes

6    regarding any events on that particular day, November 3rd,

7    2017?

8    **A.**    Yes.

9    **Q.**    Do you know if those videos were provided to law

10   enforcement?

11   **A.**    Yes, they were.

12   **Q.**    Did you have an opportunity to review those videos?

13   **A.**    I did.

14   **Q.**    Did you review those videos on November 3rd, 2017?

15   **A.**    Yes.

16   **Q.**    Did you have a chance to review those videos today?

17   **A.**    Yes.  A brief look, yes.

18              MR. ARTHUR:  May I approach, Your Honor?

19              THE COURT:  Yes, you may.

20              MR. ARTHUR:  I'm going to try to do it right this

21   time.

22        Would you please mark it as United States Exhibit

23   number 2?  Thank you.

24              BY MR. ARTHUR:

25   **Q.**    What I am handing you, sir, has been marked as Exhibit

1    number 2.  Would you care to go ahead and pull out the disc,

2    please?

3    **A.**    Sure.

4    **Q.**    Do you recognize that disc, sir?

5    **A.**    Yes.

6    **Q.**    And how do you recognize that disc?

7    **A.**    We reviewed this earlier today.

8    **Q.**    And does it have any identification to reflect that you

9    reviewed that?

10   **A.**    Yes.

11   **Q.**    Can you describe to the court what's on the disc?

12   **A.**    Well, the date -- the date and my initials that I

13   reviewed it.

14   **Q.**    And what are your initials, sir?

15   **A.**    JW.

16   **Q.**    That's on the disc?

17   **A.**    Correct.

18   **Q.**    You had the opportunity to review the content of that

19   disc?

20   **A.**    Yes.

21   **Q.**    Does that fairly and accurately depict what you

22   reviewed on November the 3rd, 2017?

23   **A.**    Yes.

24   **Q.**    Sir, what I would like to do is show you one of the two

25   videos that are on that disc related to events on

1    November 3rd, 2017.

2            MR. KATZ:  Your Honor, can I just inquire very

3    quickly, is this the -- again, the same discs that were

4    provided in discovery?

5            MR. ARTHUR:  That's correct, yes.

6            MR. KATZ:  Okay, sir.  Thank you.

7            THE COURT:  Go ahead, Mr. Arthur.

8            MR. ARTHUR:  She's going to play it.  One second.

9            THE COURT:  Is it going to come up here?

10       You can turn around and watch it with me.

11           THE WITNESS:  Okay.

12       (Recording played in open court)

13           BY MR. ARTHUR:

14   **Q.**  Sir, that particular video, do you know where that

15   camera is located at?

16   **A.**  Yes.  It's on the front right corner of the fire

17   station, under the eve.

18   **Q.**  So, it would be on the right side of the screen; is

19   that correct?

20   **A.**  Correct.

21   **Q.**  Does your parking lot at the fire department end on

22   that part of the screen; is that correct?

23   **A.**  Yes.

24   **Q.**  And what part of the fire building is that camera at?

25   **A.**  What part of the fire building?

1    **Q.**   Yes.

2    **A.**   The front -- or if you're looking at the front left

3    corner.

4    **Q.**   Are you familiar with the location that that camera is

5    pointing to?

6    **A.**   Yes.

7    **Q.**   What is in front of that that was played on the video?

8    **A.**   Well, it's covering the front three bays of the fire

9    department.  And then, across the road is the old Man

10   Hospital.

11   **Q.**   Is there anything across the street right now?

12   **A.**   No.  It's just an empty lot.

13   **Q.**   Okay.  On the left that you're looking at, where

14   there's some grass, what is on the left there?

15   **A.**   That's Man High School.

16   **Q.**   And on the right, is there anything on the right?

17   **A.**   To the right of the camera is actually the little

18   league baseball field, concession stand and stands.

19   **Q.**   Does that picture depict a camera number or any other

20   identifying information?

21   **A.**   Yes.  It says "channel 15".

22   **Q.**   Is says what, sir?

23   **A.**   "Channel 15".  It's the port that the camera is plugged

24   into.

25   **Q.**   So, that would be a specific camera in the building?

1    That's how it's identified?

2    **A.**   Correct.

3    **Q.**   We're going to show you a second video.

4         (Recording played in open court)

5              BY MR. ARTHUR:

6    **Q.**   All right, sir, same question.  Did you recognize the

7    location where that video played?

8    **A.**   Yes.

9    **Q.**   And where is that location at?

10   **A.**   That's the side street basically of the fire station.

11   Looks like camera -- or Channel 9 looking at the side street

12   of our fire department and, also, the yard of Man High

13   School.

14   **Q.**   Where is the camera located on the building?

15   **A.**   Under the gutter area, soffit area.

16   **Q.**   Is that video a fair and accurate depiction of the

17   actual video from November 3rd, 2017?

18   **A.**   Yes.

19   **Q.**   Has this video been altered or edited in any way?

20   **A.**   No.

21             MR. ARTHUR:  The United States moves into evidence

22   United States Government Exhibit number 2.

23             THE COURT:  Any objection, Mr. Katz?

24             MR. KATZ:  No, Your Honor.

25             THE COURT:  It's admitted.

1          **GOVERNMENT EXHIBIT 2 ADMITTED**

2          MR. ARTHUR:  The United States has no further

3    questions for this witness.

4          THE COURT:  Do you want to cross examine him, Mr.

5    Katz?

6          MR. KATZ:  Just a couple.

7          **CROSS EXAMINATION**

8          **BY MR. KATZ:**

9    **Q.**   Clip 01, the first one that you say you had an

10   identification and it had 15:32:28 -- now, I assume that was

11   the time, but then you confused me a little bit by saying

12   that was camera 15 but, in fact, that is the time when this

13   camera is rolling, the time of the day; is that right?

14   **A.**   Yes, sir.  The 15 dot whatever it was, that's military

15   for 3:30.

16   **Q.**   3:00 or whatever?

17   **A.**   Yes, sir.

18   **Q.**   Okay.  And then, the second one was 15:33:04.  Are they

19   synchronized because it was a different camera?

20   **A.**   Yeah.  They would be on the same time, yes, sir.

21   **Q.**   Okay.

22          MR. KATZ:  That's all the questions I have, Your

23   Honor.  Thank you.

24          THE COURT:  Anything else?

25          MR. ARTHUR:  No, Your Honor.

1              THE COURT:  Mr. Wimmer, you may step down.  Thank

2     you, sir, very much.

3              THE WITNESS:  Thank you, Your Honor.

4              MR. ARTHUR:  Your Honor, the United States would

5     like to call Deputy Officer Lilly.

6              THE COURT:  Okay.

7              COURTROOM DEPUTY CLERK:  Would you please state

8     your name?

9              THE WITNESS:  Zachary Lilly.

10             COURTROOM DEPUTY CLERK:  Please raise your right

11    hand.

12             **ZACHARY LILLY, GOVERNMENT WITNESS, SWORN**

13             COURTROOM DEPUTY CLERK:  Thank you.  Please take a

14    seat.

15             THE WITNESS:  Thank you.

16                      **DIRECT EXAMINATION**

17             **BY MR. ARTHUR:**

18    **Q.**  Good afternoon, sir.  Please state your name for the

19    record.

20    **A.**  Zachary Lilly.

21    **Q.**  And where are you employed, sir?

22    **A.**  Logan County Sheriff's Office.

23    **Q.**  When did you start there?

24    **A.**  December of 2015.

25    **Q.**  What are your primary duties for the Sheriff's

1   Department?

2   **A.**   Mainly taking 911 calls.

3   **Q.**   And what geographical location does that include?

4   **A.**   The entire County of Logan.

5   **Q.**   Is Greenville an area that's in that county?

6   **A.**   Yes, sir.

7   **Q.**   Same question about -- how about Man, West Virginia, is

8   that also in Logan?

9   **A.**   Yes, sir.

10  **Q.**   So, just to make sure it's clear, you were employed

11  with the Logan County Sheriff's Department on November the

12  3rd, 2017?

13  **A.**   Yes, sir.

14  **Q.**   Do you know if you worked on November 3rd, 2017?

15  **A.**   Yes, sir.

16  **Q.**   And how do you recall that you worked on November 3rd,

17  2017, sir?

18  **A.**   One would be because of this case.

19  **Q.**   And during -- or on that particular day, November 3rd,

20  2017, what shift did you work?

21  **A.**   I worked 3:00 p.m. to 11:00 p.m.

22  **Q.**   Is that typically the shift that you work?

23  **A.**   I typically work different shifts during the week.

24  **Q.**   So, on November 3rd, 2017, your shift started at

25  3:00 p.m.?

1    **A.**   Yes, sir.

2    **Q.**   Do you recall receiving any 911 calls on that

3    particular day?

4    **A.**   Yes, sir.

5    **Q.**   Was that around the beginning of your shift?

6    **A.**   Yes, sir.

7    **Q.**   How are 911 calls relayed to you as a deputy in the

8    sheriff's office?

9    **A.**   They put out "Central to any unit available" and they

10   give the area.

11   **Q.**   On this day, is that how the 911 calls were relayed to

12   you?

13   **A.**   Yes, sir.

14   **Q.**   I would like to play for you to hear an audio that's

15   already been admitted for the 911 call, sir.

16       (Recording played in open court)

17           BY MR. ARTHUR:

18   **Q.**   Do you recognize that call, sir?

19   **A.**   Yes, sir.

20   **Q.**   It mentions a number, "19".  Do you know what that is?

21   **A.**   That would have been my unit number at the time for the

22   Sheriff's Office.

23   **Q.**   So the officer at 911 was actually speaking directly to

24   you as unit 19; is that correct?

25   **A.**   Yes, sir.

1    **Q.**   What is a signal 24?

2    **A.**   It's pretty much just drugs.  It's our signal code for

3    some sort of drug.

4    **Q.**   The 911 caller also, the dispatch, mentioned a known

5    drug house in Greenville.  Are you familiar with the

6    Greenville area?

7    **A.**   Yes, sir.

8    **Q.**   In your opinion, or based on your experience, is there

9    drug activity there?

10   **A.**   Yes, sir.

11   **Q.**   He also mentioned a specific house, 671 Greenville.

12   Are you familiar with that specific area?

13   **A.**   No, sir.

14   **Q.**   Is that -- do you know where that is located at?

15   **A.**   Not -- not exactly.

16   **Q.**   When you first got the call, were you in your car?

17   **A.**   Yes, sir.

18   **Q.**   And how did you proceed at that time when you got the

19   call?

20   **A.**   I proceeded toward the Man area just casually, no

21   lights, no sirens, nothing like that, just to go to the area

22   and check it out.

23   **Q.**   How did you perceive this?  Did you perceive it as a

24   high risk call?

25   **A.**   Not at all.

1    **Q.**   And why not, sir?

2    **A.**   Just not -- I mean, it wasn't an absolute emergency,

3    something we would run lights and sirens for.

4    **Q.**   When you arrived, what did you first observe when you

5    arrived in that area close to the fire department?  What did

6    you first observe?

7    **A.**   I seen a male and female matching the description given

8    to me by 911.

9    **Q.**   When you say matching description, anything specific

10   you can recall so that you can pinpoint these two

11   individuals?

12   **A.**   The clothes that they were wearing.

13   **Q.**   In particular, what types of clothes?

14   **A.**   He had a brown jacket, blue jeans, and the female was

15   supposed to have red hair and a pink sweater on.

16   **Q.**   Did both of them fit that description?

17   **A.**   They did.

18   **Q.**   On that day, around that time, did you see anyone else

19   on the street in that location?

20   **A.**   No, sir.

21   **Q.**   The male that you observed on November 3rd, 2017, can

22   you tell if that person is in the courtroom today?

23   **A.**   Yes, sir.

24   **Q.**   Can you point to the court who that person is?

25   **A.**   Mr. Fields.

1    **Q.**   And are you directing to the defense counsel table?

2    **A.**   Yes, sir.

3    **Q.**   The individual that's sitting there?

4    **A.**   Yes, sir.

5    **Q.**   After you observed the two individuals on the street,

6    what did you do next?

7    **A.**   I had passed them up and I turned around just past the

8    fire department and pulled in kind of behind them as they

9    were walking.

10   **Q.**   Did you call for backup?

11   **A.**   No, sir.

12   **Q.**   Can you explain why not?

13   **A.**   There was no reason at the time.

14   **Q.**   Where did you park your car?

15   **A.**   Just past the front of the bay doors at the fire

16   department.

17   **Q.**   What is parking like right there?

18   **A.**   It's narrow.  There's not really any place to park

19   where I pulled.

20   **Q.**   Were the two individuals on the roadway at that time?

21   **A.**   Yes, sir.

22   **Q.**   Are individuals allowed to walk on the roadway under

23   West Virginia law?

24   **A.**   I don't believe so.

25   **Q.**   How close were you able to park to these two

1    individuals?

2    **A.**    I was approximately 15-20 feet away from them.

3    **Q.**    Is that because there was no place to park to get

4    closer?

5    **A.**    Correct.

6           THE COURT:  Did you notice any weapons on either

7    one of them at the time you first saw them?

8           THE WITNESS:  No, sir, I did not.

9           BY MR. ARTHUR:

10   **Q.**    After you parked, did you exit your vehicle?

11   **A.**    Yes, sir.

12   **Q.**    And what did you do next, sir?

13   **A.**    I proceeded to walk towards them and I asked them -- I

14   don't remember the correct words that I used, but I asked

15   them to come toward me and to step out of the road and I

16   asked their names and that's as far as I got.

17   **Q.**    When you say "as far as you got", approximately how

18   much time did you have an interaction from when you got out

19   of your car to when you first saw these people?

20   **A.**    Very few seconds.

21   **Q.**    I'm going to show you a video, sir.

22        (Recording played in open court)

23           BY MR. ARTHUR:

24   **Q.**    Okay, sir, I had her stop the video.  First question

25   is, did you see your deputy car go by there?

1   **A.**   Yes, sir.

2   **Q.**   And what roadway is that, do you know?

3   **A.**   I don't know the exact name of it, sir.

4   **Q.**   And you parked right there, correct?

5   **A.**   Yes, sir.

6   **Q.**   Okay.  On that screen, do you see where the time is at?

7   **A.**   Yes, sir.

8   **Q.**   And what is the time there?

9   **A.**   15:23:23.

10          MR. ARTHUR:  Okay, go ahead.  And we're going to

11  go a little bit further.

12          (Recording played in open court)

13          BY MR. ARTHUR:

14  **Q.**   All right, sir.  First of all, is that you in that

15  video?

16  **A.**   Yes, sir.

17  **Q.**   Is that the defendant in front of you running?

18  **A.**   Yes, sir.

19  **Q.**   On the screen, what is the time on that?

20  **A.**   15:23:57.

21  **Q.**   You identified the time just a minute ago as 15:32:32.

22  The 32 being seconds; is that correct?

23  **A.**   Yes, sir.

24  **Q.**   And in this one it's 15:23:57, correct?

25  **A.**   Yes, sir.

1   **Q.**   So, a half a minute hasn't gone by based on when you

2   first stopped your car, correct?

3   **A.**   Yes, sir.

4   **Q.**   Is it fair that the interaction that you had with the

5   defendant is approximately 10 or 15 seconds, at most?

6   **A.**   Yes, sir.

7   **Q.**   During that chase, sir, did you pull your gun at that

8   time?

9   **A.**   No, sir.

10   **Q.**   How far did you chase him up to that point?

11   **A.**   Probably 15 -- 15 or 20 feet, something like that, past

12   my patrol car.

13   **Q.**   Now, when you -- when you talked to them, you mentioned

14   that it was very brief and that you asked them to come

15   towards you?

16   **A.**   Yes, sir.

17   **Q.**   Was that because they were on the road?

18   **A.**   Yes, sir.

19   **Q.**   Would it be fair to say that safety was a concern?

20   **A.**   Yes, sir.

21   **Q.**   Did the male comply with that request to come off the

22   roadway?

23   **A.**   He started to step out back into the road further.

24   **Q.**   So, he stepped further into the road?  And what did you

25   do next when he stepped further into the road?

1    **A.**   That's when he took off running.

2    **Q.**   Did you ask him his name?  I believe you testified that

3    way before?

4    **A.**   Yeah.  I asked him his name before he ran.

5    **Q.**   And when you asked him his name, did he run after that?

6    **A.**   Yes.

7    **Q.**   How about the female, did she comply?

8    **A.**   She did.

9    **Q.**   What was your -- what was your objective when you went

10   to speak with them in your mind at that time?

11   **A.**   Just to speak with them, see where -- who they were,

12   where they were going, just --

13   **Q.**   When you first talked to them, did you raise your

14   voice?

15   **A.**   No, sir.

16   **Q.**   What was the tone in your voice at that time?

17   **A.**   Calm.  I didn't raise my voice at all.

18   **Q.**   Before he started running, any reason to be irritated?

19   **A.**   No, sir.

20   **Q.**   Any other officers present at that time?

21   **A.**   No, sir.

22   **Q.**   And did you call for any other officers at that stage?

23   **A.**   No, sir.

24   **Q.**   Okay, sir.  I'm going to show you the next video.

25            (Recording played in open court)

1              **BY MR. ARTHUR:**

2      **Q.**   Does that video also accurately depict what happened

3      that day?

4      **A.**   Yes, sir.

5      **Q.**   I'm going to ask you some specific questions.  So, it

6      appears to me that you caught up with the defendant at some

7      stage?

8      **A.**   Yes, sir.

9      **Q.**   Okay.  We stopped this one here.  At this stage, do you

10     see a gun in his hand?

11     **A.**   Yes, sir.

12     **Q.**   And is that gun actually pointing at you?

13     **A.**   I'm not sure.

14     **Q.**   The gun is in his hand, correct?

15     **A.**   I believe so.

16     **Q.**   Also, can you see a knife on his side --

17     **A.**   Yes, sir.

18     **Q.**   -- in that picture?  When you were chasing after him,

19     what types of commands did you give him when he was running

20     up to this point?

21     **A.**   I had asked him to stop.

22     **Q.**   And, up to this point, you have not pulled your

23     revolver, correct?

24     **A.**   No, sir.

25     **Q.**   We're going to go ahead and show the rest of the video.

1          (Recording played in open court)

2              BY MR. ARTHUR:

3   **Q.**   All right.  He escaped there, correct?

4   **A.**   Yes, sir.

5   **Q.**   Okay.  After he escaped, what happened next?

6   **A.**   After he got away from me there, I tried to grab ahold

7   of him again and I seen the gun in his hand, so I backed off

8   and drew my weapon.

9              THE COURT:  He had the gun in his hand by that

10  time?

11             THE WITNESS:  Yes, sir.  He had the gun in his

12  hand.

13             THE COURT:  Was he pointing it at you?

14             THE WITNESS:  He was not.

15             BY MR. ARTHUR:

16  **Q.**   How far did he run with the gun in his hand?

17  **A.**   50 feet or so.

18  **Q.**   Before he dropped the gun?

19  **A.**   Before he dropped the gun, yes, sir.

20  **Q.**   Why did he drop the gun after 50 feet?

21  **A.**   I gave him commands to drop the gun.  I told him I was

22  going to kill him.

23  **Q.**   You said you were going to kill him?

24  **A.**   Yes, sir.

25  **Q.**   Is that the actual language that you used that day?

1    **A.**   I may have used some choice words, but to that effect,

2    yeah.

3    **Q.**   With a defendant with a gun in his hand after this

4    dispute, did you think -- did you get to a point that you

5    almost pulled the trigger?

6    **A.**   Yes, sir.

7              THE COURT:  You said you actually pulled the

8    trigger on your gun?

9              THE WITNESS:  No, sir, I did not.

10             THE COURT:  You just got to the point where you

11    were thinking about it?

12             THE WITNESS:  Yes, sir.

13             BY MR. ARTHUR:

14    **Q.**   All right.  You testified, sir, from that point.  So,

15    let me back up.  So, from where you parked to where you

16    caught up with them, about how many feet before you caught

17    up with them?

18    **A.**   I'm not sure.  It's probably a good 100-150 feet from

19    where I caught him to where I started chasing him.

20    **Q.**   Okay, and then he escaped?  And how far did he run

21    again?

22    **A.**   Once he got away from me, he ran all the way to the

23    riverbank from there.

24    **Q.**   And how far is that?

25    **A.**   That's probably 100 yards to where he jumped in the

1    river or more.

2    **Q.**   And that's how he escaped that day, correct?

3    **A.**   Yes, sir.

4    **Q.**   Okay.  Going back to the gun, your car is parked there.

5    Did he run past your car again?

6    **A.**   Yes, sir.

7    **Q.**   Did he -- where did he throw the gun in that whole

8    video thing we just watched?

9    **A.**   He threw the gun almost under the rear of my cruiser.

10   **Q.**   And you saw him throw the gun?

11   **A.**   Yes, sir.

12   **Q.**   After he escaped, did you go back and retrieve the gun?

13   **A.**   Yes, sir.

14   **Q.**   During this chase, where was the female?

15   **A.**   She was at the point of initial contact.  I don't think

16   she moved at all from where I had spoken to them initially.

17   **Q.**   Was she arrested?

18   **A.**   No, sir.

19   **Q.**   Was she allowed to leave?

20   **A.**   Yes, sir.

21   **Q.**   Just a few more questions.  One thing, the guy had a

22   gun, and that's close to a school.  Did you have to report

23   anything regarding a guy and gun close to the school there?

24   **A.**   No, sir.

25   **Q.**   No?  Do you know if the schools were locked down or

1    anything?

2    **A.**    I was told by a 911 dispatcher that they were.

3           MR. ARTHUR:  No further questions for this

4    witness, Your Honor.

5           THE COURT:  Mr. Katz?

6           MR. KATZ:  Yes, Your Honor.  Thank you.

7                     **CROSS EXAMINATION**

8           **BY MR. KATZ:**

9    **Q.**   Sir, to a certain extent, I want to just review a few

10   of the things that you have just said, testified to, make

11   sure that I have an understanding of what happened and the

12   record is clear about what happened.  So, I want to do it

13   primarily in chronological order, okay?

14          So, you received the 911 call that we heard, and you

15   proceed to that area, and you're driving.  Now, we saw a

16   road on the videos.  Was that the road that the two

17   individuals were walking on?

18   **A.**    Yes, sir.

19   **Q.**   Okay.  So, if we want to look at like how wide the road

20   was and that kind of stuff, I mean, that's the road that we

21   saw, right?

22   **A.**    Yes, sir.

23   **Q.**   Okay.  And so, you're driving; and then, I guess, you

24   pass them?  They're, like, on the right?

25   **A.**    They were on the left side of the road.

1    **Q.**   Okay.

2    **A.**   As I was driving by, they were on the left side of the

3    road.

4    **Q.**   Okay.  And then you park your vehicle.  And I think you

5    said it was 10-20 feet away from where they were?

6    **A.**   Yes, sir.

7    **Q.**   Okay.  And you get out of the vehicle and you walk

8    towards them?

9    **A.**   Yes, sir.

10   **Q.**   I notice there you came in uniform.  Is that similar to

11   the uniform that you were wearing at the time?

12   **A.**   Yes, sir.  This would be our winter uniforms.  At the

13   time, we were still in summer short sleeve uniforms.

14   **Q.**   Okay.  Is it the same basic color?

15   **A.**   Same color, yes, sir.

16   **Q.**   You wear the badge?

17   **A.**   Yes, sir.

18   **Q.**   I noticed when you came in you had a holster.  I didn't

19   check to see if you actually had a gun.

20   **A.**   No, sir.

21   **Q.**   But you had a holster?

22   **A.**   Yes, sir.

23   **Q.**   And, typically, you wear a gun?

24   **A.**   Yes, sir.

25   **Q.**   And you would have had a gun at that point, right?

1    **A.**   Yes, sir.

2    **Q.**   In fact, you said you thought about shooting the gun,

3    right?

4    **A.**   Yes, sir.

5    **Q.**   Okay.  And so, you approached, and I want to try to

6    just ask you again what you had said to the two individuals.

7    And what I'm using as my basis for the next couple of

8    questions is, I was given in discovery what I call a police

9    report, and there's a narrative about what happened and,

10   because of the pronoun used, "I", I'm just going to assume

11   that you -- that you drafted the police report.  Do you

12   remember drafting a report that had a narrative about what

13   happened?

14   **A.**   Yes, sir.

15   **Q.**   Okay.  And this isn't a memory test.  I can have you

16   look at this, but I just want to see if you agree with

17   what's in there.  And I'm just asking you to accept that I'm

18   reading this correctly.  On the third line, you said --

19   okay, this is the point where you're out of the vehicle and

20   you're walking towards them.  "I asked them both to step

21   back towards my vehicle in which Mr. -- Ms. Walls complied

22   and Mr. Fields did not."  Is that the words that you used,

23   "stepped back towards my vehicle"?

24   **A.**   Yes, sir.

25   **Q.**   Okay.  "And when I asked him a second time", so he --

1  it said maybe "he backed up", but he didn't comply the first

2  time, right?

3  **A.**   No, sir.

4  **Q.**   And so, you asked him a second time, "Step back towards

5  my vehicle"?

6  **A.**   I believe so.

7  **Q.**   Okay.  Now, you were asked a question about whether or

8  not generally this was a high crime area.  All this stuff

9  that's occurred is obviously very close to the fire station,

10  right?

11  **A.**   Yes, sir.

12  **Q.**   In fact, you probably understand that that's actually

13  the fire station cameras that were taking the video we

14  looked at?

15  **A.**   Yes, sir.

16  **Q.**   By the way, did you -- do you have a video camera on

17  your own -- on your cruiser?

18  **A.**   I do, sir, but it does not work unless you have your

19  lights on.

20  **Q.**   Okay.  Okay.  Okay.  And so, we heard testimony from

21  the chief of the fire department that said there were five

22  outside cameras.  Does that seem about right to you, that

23  there's five outside cameras on the -- around the fire

24  station?

25  **A.**   I believe so.

1    **Q.**   And so, I would assume, with five cameras, there's

2    probably not much drug activity right around the fire

3    station, is there?

4    **A.**   Not that I'm aware of.

5    **Q.**   Okay.  I'm sorry.  I'm kind of going out of

6    chronological order just for a second because I'm looking on

7    my notes and there's a question I meant to ask you.

8          Okay.  Again, you're in your vehicle.  When you're

9    passing them, they're on your left.  You turn around and

10   then you park about 15-20 feet around.  Once you turned

11   around, how far did you have to go back towards them before

12   you parked?

13   **A.**   I got as close to them as I could.

14   **Q.**   Yes, sir, and I'm not asking the question very well.

15   When you turned around, at that point -- or, let's say, were

16   they in sight?

17   **A.**   Yes, sir.

18   **Q.**   Okay.  So, the -- assume there was not a very far

19   distance from the time that you turned around and then you

20   eventually parked?

21   **A.**   Yes, sir.

22   **Q.**   Okay.

23          MR. KATZ:  Your Honor, I think that's all the

24   questions, sir.  Thank you.

25          THE COURT:  Mr. Arthur, do you have anything else?

1          MR. ARTHUR:  Nothing further, Your Honor, and I

2     have no further witnesses.

3          THE COURT:  All right.  Officer Lilly, you're free

4     to go.  Thank you, sir, very much.

5          THE WITNESS:  Thank you, sir.

6          THE COURT:  I appreciate you.

7       Okay, do you want to make any further argument, Mr.

8     Katz?

9          MR. KATZ:  No, Your Honor.  I think that the

10    testimony pretty much, you know, just went as we expected it

11    to go.  And, again, I think it was clear that those are very

12    particularized -- that Mr. Fields would have been aware that

13    he was the target of -- the fact that the deputy sheriff

14    came by in what was obviously marked as a deputy sheriff

15    cruiser with, you know, just a little bit over 15 or 20 feet

16    in front of them, the vehicle turned to, you know, passes

17    them, turns around, parks.  He gets out.

18       Again, you know, with *Jones*, all of this is very

19    relevant to creating a stop and that, again, he says, you

20    know, "Come over to my vehicle."  And he repeats it, "Come

21    over to my vehicle."

22       So, you know, under the *Jones* case and under the cases

23    that we cited, that was a stop.  And, again, for the reasons

24    I argued, I don't want to continue to repeat myself, Your

25    Honor, I did just want to emphasize that the testimony was

1    very similar to what my original argument was, Your Honor.

2              THE COURT:  All right.  Thank you, Mr. Katz.

3        Mr. Arthur?

4              MR. ARTHUR:  Yes, Your Honor.  The United States

5    should prevail on three reasons.  First of all, the

6    defendant is asking this court to basically make law.  We

7    just watched a video showing an interaction, best, 10 or

8    15 seconds of communications is asking this court to find

9    that law enforcement is not permitted to speak to a citizen

10   on the street.

11       The Fourth Circuit -- and we're going to use *Jones*.

12   The Fourth Circuit, as I quote, "As a general matter, law

13   enforcement officer did not effectuate a detention or

14   seizure merely by approaching an individual on the street or

15   in other public places and putting questions to them."

16       In this case, there was a 911 call.  Sadly, the 911

17   dispatcher did not relay, the United States concedes, did

18   not relay the most pertinent facts, and that was the person

19   had a gun and the person had a knife.  But the 911

20   dispatcher still relayed drug activity in an area known --

21       THE COURT:  So, Officer Lilly didn't -- wasn't told he

22   had a gun and a knife, didn't see a gun and a knife, until

23   he took off running?  That's right, isn't it?

24              MR. ARTHUR:  That is correct.  Yes, that's

25   correct.  But the interaction was so brief, 10 or 15 seconds

1    of interaction, the reasonable suspicion at that time is

2    when the person ran, which that reflects and supports

3    criminal activity afoot.

4         We're talking about a very short -- basically, this

5    officer testified, get off the road, and I would also argue

6    that reasonable suspicion would be the person walking in the

7    roadway, which is not allowed under West Virginia law.  So,

8    that alone, from a safety standpoint --

9              THE COURT:  Yeah.  He didn't say that's why he

10   stopped him.

11             MR. ARTHUR:  He did not, that's true.  Still,

12   we're having a 10 or 15 second exchange, get off the roadway

13   and what's your name.  Based on that, then he ran.  And the

14   fight is when the reasonable suspicion for him to chase --

15   and that's when he saw a gun.  Luckily, the officer didn't

16   get killed on that date.

17        And the Fourth Circuit has agreed there.  The United

18   States Supreme Court, also in the *Mendenhall* case, outlined

19   specific factors to make a determination whether detention's

20   seizure when law enforcement communicates with a person; in

21   particular, they looked at factors like, did he draw the

22   gun?  Were there other officers?  What was the tone of the

23   language?  None of those factors are consistent here.

24        The only factor that the defense can push to is him

25   asking the people briefly, for only a few seconds, to get

 1    off the roadway.

 2         Our argument here is a minimal communication of just a

 3    few seconds does not constitute a seizure.  And, again,

 4    using a Fourth Circuit case, the *United States v.*

 5    *Crittendon*, where the Fourth Circuit said, "A police officer

 6    may stop and briefly detain a person for investigatory

 7    purposes if the officer had a reasonable suspicion supported

 8    by articulable facts that criminal activity may be afoot."

 9    The 911 call, the behavior of the defendant, and the flight

10    would support that.

11         And it's a commonsensical approach here based on this

12    officer's experience, based on an area in Greenville that

13    was known to have drug activity, a house, particular, that

14    is known to have drug activity, and the behavior of the

15    people walking in the roadway.

16         Finally, Your Honor, even assuming arguendo that this

17    was a detention that would implicate the Fourth Amendment,

18    the officers still had reasonable suspicion.  And this

19    standard is very low.  It's not even a preponderance of the

20    evidence low, and when you look at the officer's safety, the

21    burden is very low.

22         And so, the United States would say that there's

23    reasonable suspicion that criminal activity was afoot and he

24    -- the officer articulated that reasonable --

25              THE COURT:  All he knew was reasonable suspicion

1    of criminal activity doesn't constitute in being told -- in

2    being told somebody is walking around -- or walking down the

3    street in an area known to be a -- associated with drug

4    dealing, is it?

5              MR. ARTHUR:  I think it does, because he did relay

6    that there was drug activity.  Signal 24, as the officer

7    said, that drug activity could be possession or selling in

8    an area that has a lot of drug problems.

9        And then the flight.  There was an unprovoked flight

10   here.  We're talking about a 10 or 15 second exchange and

11   that person ran.  That's when reasonable suspicion -- when

12   he ran unprovoked twice also would go under the reasonable

13   suspicion.

14             THE COURT:  Is that it?

15             MR. ARTHUR:  That's it, Your Honor.

16             THE COURT:  Thank you, Mr. Arthur.

17        Do you want to add anything else, Mr. Katz?

18             MR. KATZ:  Just very quickly, Your Honor.  Several

19   times, the Assistant U. S. Attorney has mentioned about the

20   brief nature of the stop and as if that's determinative.

21   Your Honor, how long does it take to say, "You're under

22   arrest"?  You know, so I'm not saying that that's what was

23   said, but it's what is being said and what's the action.

24   It's not the length of the interaction between the two

25   individuals.  It takes four seconds to put somebody under

1    arrest or less.

2            THE COURT:  I'm going to take this matter under

3    advisement and read the cases, but I've got a pretty clear

4    picture of what happened.  And when is this case set for

5    trial, Mr. Arthur?

6            COURTROOM DEPUTY CLERK:  20th.  March the 20th.

7            THE COURT:  March the 20th?

8            MR. ARTHUR:  That's correct, Your Honor.

9            THE COURT:  Okay.  Well, I will decide this within

10   the next 24 to 48 hours and let you know, but I do want to

11   look at the cases again.  I think, in fairness to the

12   defendant and the government, I ought to do that.

13           MR. ARTHUR:  Thank you, Your Honor.

14           MR. KATZ:  Thank you, sir.  Thank you.

15           THE COURT:  Okay?  All right.  This hearing is

16   concluded and the defendant is remanded to custody.  And

17   we'll take a brief recess.

18       (Proceedings concluded at 4:00 p.m., March 5, 2019.)

19

20   CERTIFICATION:

21

22       I, Ayme A. Cochran, Official Court Reporter, certify

23   that the foregoing is a correct transcript from the record

24   of proceedings in the matter of United States of America,

25   Plaintiff v. Jay James Fields, Defendant, Criminal Action

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    No. 2:18-cr-00215, as reported on March 5, 2019.

2

3    s/Ayme A. Cochran, RMR, CRR                    March 17, 2019

4    Ayme A. Cochran, RMR, CRR                           DATE

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25