**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON**

**UNITED STATES OF AMERICA**


**v.**                                    **CRIMINAL NO.    2:18-00215**


**JAY JAMES FIELDS**


<u>**MEMORANDUM OPINION AND ORDER**</u>

Pending before the court is defendant's motion to suppress evidence "obtained as a result of a stop made without reasonable suspicion."  On March 5, 2019, the court conducted an evidentiary hearing on defendant's motion.  For reasons expressed more fully below, the motion to suppress is **DENIED.** In support of its ruling, the court makes the following findings of fact and conclusions of law.

<u>I.  Findings of Fact</u>

On the afternoon of November 3, 2017, the Logan County, West Virginia 911 Center received a call[1] that two "suspicious" people who might be carrying drugs were walking in the street on the Greenville Road area near Man, West Virginia.  Government Exhibit 1.  The caller gave his name to the 911 dispatcher

---

[1] The 911 dispatcher testified that the call came "in from the Greenville Road area in the vicinity of 671."  Transcript of Pretrial Motions Hearing, March 5, 2019, at 16 (hereinafter "Tr. at ___.") (ECF No. 33)

during the phone call.  See id.  The 911 dispatcher testified

that he did not know the caller.  See Tr. at 18.

The caller described the two suspicious people as a white

male with straggly hair, wearing a brown hoodie and blue jeans;

and a white female with red hair wearing a pink sweater.  The

caller said the male had a bowie knife that was as long as his

leg and also a pistol and the pair had left a residence known

for drug activity in the Greenville Road area.  The call was

recorded, which is a routine practice.  See Gov. Ex. 1; Tr. at

11-13.

Jamie Sparks, the Logan County 911 dispatcher took the call

and promptly called the Logan County Sheriffs' department.  The

call was answered by Deputy Zachary Lilly who received the

following message from dispatcher Sparks: "**got call from

Greenville Road area, some suspicious individuals just left

residence known for signal 24[2] activity, a white male subject

wearing brown hoodie, and blue jeans, white female, red hair,

pink sweater.  Female and male last seen walking out of

Greenville heading back toward Mann."  Sparks did not mention

the knife and gun reported by the caller.

---

[2] A "signal 24" is a code word used by law enforcement for
illegal drug activity—including selling or possessing illegal
drugs.

After taking the call, Deputy Lilly proceeded to the

Greenville Road area to investigate.  See Tr. at 33.  Deputy

Lilly testified that, in his opinion, the Greenville area was

known for drug activity.  See Tr. at 33.  At approximately 3:30

p.m. he saw two people who fit the description made by the

caller walking along the highway in front of Station Number 200

of the Logan County Fire Department, within 100 feet of Mann

High School.  Deputy Lilly pulled his vehicle off the road

approximately 15 to 20 feet away from the two subjects and asked

them to come towards him and off the roadway.  See Tr. at 36-39.

The man was defendant Fields and the woman was later identified

as Kami Denice Walls.  See Tr. at 34-35; ECF 18-1 at 8, 13-15.

Fields did not comply and stepped out into the road further.

Lilly also asked Fields his name and, in response, the defendant

began to run away.  Lilly testified that he did not raise his

voice in asking these questions and spoke calmly.  Lilly pursued

Fields and grabbed the hood of his jacket.  During this pursuit,

Fields pulled out a gun.  Once Lilly saw the gun, he backed off,

drew his weapon, and commanded Fields to drop the gun.  Fields

escaped by letting his jacket be pulled off of his body and

going into a nearby river.  As he ran away, Fields threw the gun

under Lilly's vehicle.  The entire pursuit was recorded on the

fire department's video surveillance cameras. This video footage, as well as the two recorded telephone calls, were played for the court and admitted into evidence during the suppression hearing.

Deputy Lilly retrieved the gun from under his vehicle and returned to the area of the initial encounter, where Ms. Walls was waiting. She was read her Miranda rights and she then gave a statement. At that point, she identified herself as Kami Denice Walls. She said the gun was obtained for her by her boyfriend, Jay Fields. A criminal history check disclosed that Fields was a convicted felon. Fields was subsequently arrested and charged with being a felon in possession of a firearm.

The court found the testimony of all the witnesses testifying at the hearing to be entirely credible.

## II. Conclusions of Law and Analysis

The Fourth Amendment provides "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. The defendant bears the burden of demonstrating a Fourth Amendment violation, Rakas v. Illinois, 439 U.S. 128, 130 n.1 (1978), and, on appeal, the court reviews the evidence in the light most favorable to the party prevailing

4

below.  United States v. Seidman, 156 F.3d 542, 547 (4th Cir.

1998).  The factual findings underlying a motion to suppress,

including credibility determinations, are reviewed for clear

error, while the legal determinations are reviewed de novo.

Ornelas v. United States, 517 U.S. 690, 699 (1996); United

States v. Murray, 65 F.3d 1161, 1169 (4th Cir. 1995); United

States v. Rusher, 966 F.2d 868, 873 (4th Cir.), cert. denied,

506 U.S. 926 (1992).

Not every encounter between a private citizen and law

enforcement implicates the Fourth Amendment.  See United States

v. Stover, 808 F.3d 991, 995 (4th Cir. 2015) ("[The Fourth

Amendment], however, does not extend to all police-citizen

encounters."); see also United States v. McCoy, 513 F.3d 405,

411 (4th Cir. 2008) ("Of course, the protections of the Fourth

Amendment do not bear on every encounter between a police

officer and a member of the public; it is only when a `search'

or `seizure' has occurred that the Fourth Amendment comes into

play.").  As our appeals court has observed:

> The Supreme Court has recognized three distinct types
> of police-citizen interactions: (1) arrest, which must
> be supported by probable cause; (2) brief
> investigatory stops, which must be supported by
> reasonable suspicion; and (3) brief encounters between
> police and citizens, which require no objective
> justification.

United States v. Weaver, 282 F.3d 302, 309 (4th Cir. 2002)

(internal citations omitted).  At dispute in this case is

whether Officer Lilly's initial interaction with defendant[3] fell

into the second or third category.

Fields maintains that Deputy Lilly's encounter with him

fell into the second category, i.e., a Terry stop.  See ECF No.

19 at p.8 ("The Deputy Sheriff had already left his vehicle,

approached Defendant, told him that he wanted to talk with him

and ordered Mr. Fields to come stand at the end of his cruiser.

This is a stop.  And there was no reasonable suspicion to

support the same.").  In Terry v. Ohio, 392 U.S. 1, 30 (1968),

the Supreme Court held that "an officer may, consistent with the

---

[3] Ordinarily, the initial step of any Fourth Amendment
seizure analysis is "to determine whether a seizure took place
and, if so, when the seizure occurred."  United States v. Brown,
765 F.3d 278, 288 (3d Cir. 2014); see also United States v.
Smith, Criminal No. 07-00119, 2008 WL 2329103, *3 (W.D. Pa. June
4, 2008) ("[B]efore proceeding to the Terry analysis, the Court
must first determine when the officers seized Defendant Smith
hence triggering the protections of the Fourth Amendment because
the same is not implicated until a seizure occurs.").  However,
defendant's suppression motion rests entirely on his argument
that Deputy Lilly's initial encounter with him rose to the level
of a Terry stop.  At the suppression hearing, counsel for
defendant did argue in passing that the Fourth Amendment might
be implicated even if defendant was found to be seized at some
later point.  However, no evidence was developed on this point
nor was it argued by the parties.  Therefore, this Memorandum
Opinion and Order addresses defendant's argument regarding
whether his initial encounter with Deputy Lilly was a seizure
within the meaning of the Fourth Amendment.

Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." Illinois v. Wardlow, 528 U.S. 119, 123 (2000). The government, on the other hand, maintains that Deputy Lilly's initial encounter with Fields was not a Terry stop but, rather, fell into the third category noted above, i.e., a brief encounter. The government also contended there was never a seizure within the meaning of the 4th Amendment.

A. The Stop Viewed as a Brief Encounter

Of this third category—a "brief encounter"—our appeals court has observed that "[a]s a general matter, law enforcement officers do not seize individuals `merely by approaching [them] on the street or in other public places and putting questions to them.'" Stover, 808 F.3d at 995 (quoting United States v. Drayton, 536 U.S. 194, 200 (2002)); see also McCoy, 513 F.3d at 411 ("If all that is involved is the officer approaching a person, announcing that he is an officer, and asking if the person would be willing to answer some questions, then no reasonable suspicion is required because no `seizure' occurred. [. . .] Here, [the police officer] did not need an articulable suspicion to get out of his patrol vehicle, approach McCoy, inform McCoy that he was an officer, and ask to speak with him.

Although many members of the public might feel uncomfortable

when an officer approaches them in this manner and asks to speak

with them, uncomfortable does not equal unconstitutional.")

(internal citations omitted).  A person is "seized" within the

meaning of the Fourth Amendment "only when, by means of physical

force or a show of authority, his freedom of movement is

restrained."  United States v. Mendenhall, 446 U.S. 544, 553

(1980).  The Stover court articulated how a court should

determine when a seizure has occurred:

> [A]s the Supreme Court has explained, "[o]nly when the
> officer, by means of force or show of authority, has
> in some way restrained the liberty of a citizen may we
> conclude that a `seizure' has occurred."  Terry v.
> Ohio, 392 U.S. 1, 19 n.16, 88 S. Ct. 1868, 20 L. Ed.
> 2d 889 (1968).  Where, as here, physical force is
> absent, a seizure requires both a "show of authority"
> from law enforcement officers and "submission to the
> assertion of authority" by the defendant.  California
> v. Hodari D., 499 U.S. 621, 626, 111 S. Ct. 1547, 113
> L. Ed. 2d 690 (1991) (emphasis omitted).

Stover, 808 F.3d at 995.

Defendant does not argue, nor is there any evidence, that

Deputy Lilly applied physical force to him prior to his flight.

Therefore, the court must determine: (1) whether, prior to

defendant's flight, Deputy Lilly made a show of authority

directed at defendant and, if so, (2) whether defendant

submitted to it.

1.    Deputy Lilly did not make a show of authority.

To determine whether law enforcement has displayed a show of authority sufficient to implicate the Fourth Amendment, courts apply the objective test set forth in Mendenhall, 446 U.S. at 554.  Under this test, law enforcement has done so "only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."  Id.  In making this determination, courts consider several factors including the activation of a siren or flashing lights, commanding a person to halt, displaying a weapon, and operating a vehicle in an aggressive manner to block a person's course.  See, e.g., Michigan v. Chesternut, 486 U.S. 567, 575-76 (1998) (listing examples).  "'The test for existence of a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person.'"  Gardenhire v. Schubert, 205 F.3d 303, 313 (6th Cir.2000) (quoting California v. Hodari D., 499 U.S. 621, 628 (1991)).

The court finds that there was no show of authority in this case that would have made a reasonable person believe he was not free to leave.  Deputy Lilly was in a police vehicle with no

flashing lights.  He parked that vehicle approximately 15 to 20

feet from defendant.  Upon exiting his vehicle, Deputy Lilly

walked towards defendant and Walls, asked them to step out of

the road and come towards him, and asked their names.  When

Fields failed to comply, Deputy Lilly repeated his request that

defendant step toward his vehicle.  Deputy Lilly spoke in a calm

manner and never raised his voice.  Fields was never threatened.

Indeed, the entire interaction lasted no longer than

approximately 10 to 15 seconds.  Deputy Lilly's account of the

duration of the encounter is corroborated by the videotape shown

at the suppression hearing.  Furthermore, Deputy Lilly's

testimony is consistent with the police report he prepared on

November 4, 2017.  See ECF 18-1 at p.8.  Walls's statement

provided to law enforcement is also in line with Deputy Lilly's

testimony.  See ECF 18-1 at pp. 14-15 ("A deputy was coming from

the opposite direction and pulled up on us beside the little

league field.  While the deputy was pulling up, Jay told me not

to run.  The deputy got out.  He asked Jay what his name was.

Jay took off running.").

 Numerous courts have found the requisite show of authority

to be lacking under similar circumstances.  For example, in

United States v. Lewis, the court found that the police officer

10

did not display a show of authority sufficient to implicate the

Fourth Amendment.  Crim. No. 4:17-cr-887-RBH, 2018 WL 827286, *3

(D.S.C. Feb. 12, 2018).  The Lewis court explained:

> Applying the Mendenhall factors to this case compels a
> finding and conclusion that Defendant Lewis was not
> seized because a reasonable person under the
> circumstances would have felt free to leave and
> terminate the encounter with Sergeant Townsend.  There
> was only one officer present at the scene.  Although
> Sergeant Townsend was in uniform, he did not display
> his weapon.  Sergeant Townsend did not touch Lewis or
> make any attempt, nor was he able, to block his
> departure prior to Lewis's flight.  The language used
> by Sergeant Townsend was informal and non-threatening.
> "Hey man, let me talk to you for a minute."  Sergeant
> Townsend asked Lewis to "come here" but Lewis did not
> comply, instead Lewis asked Sergeant Townsend "for
> what?"  When Sergeant Townsend informed Lewis that he
> needed to see Lewis's identification and that there
> was a warrant for a "Lewis" subject, Lewis fled and
> terminated what, up until that point, had been a
> consensual police encounter.

Id.; see also United States v. Sullivan, No. 3:09-CR-28, 2010 WL

1257720, *5 (W.D. Ky. Mar. 26, 2010) ("The Court finds that

there was no show of authority in this case that would have made

a reasonable person believe he was not free to leave.  The

police officers, in plainclothes attire, were in a police

vehicle with no flashing lights.  The vehicle did not block

Defendant's driveway.  The officers approached Defendant at a

walking pace.  Their guns were holstered.  Defendant was never

threatened, nor is there evidence that the detectives spoke in

an authoritative tone of voice."); <u>United States v. Rice</u>,

Criminal Action No. 2:09-68-DCR, 2009 WL 3711333, *1,3 (E.D. Ky.

Nov. 4, 2009) (finding that "encounter was clearly consensual"

where police officer "parked his marked patrol car along the

street, exited the vehicle and stated in a loud voice, `Sir, may

I talk to you for a minute.'"); <u>United States v. Foster</u>, 376

F.3d 577, 584 (6th Cir. 2004) (Defendant was not seized when

police approached him on foot, asked him his name, what he was

doing there, and if he had any form of identification.).

    2.    Fields Did Not Submit to the Alleged Show of
           Authority.

Even if the court determined that Deputy Lilly demonstrated

a show of authority sufficient to implicate the Fourth

Amendment, it is clear that Fields did not submit to that

authority.  According to the <u>Stover</u> court:

> [I]n cases where the individual does not clearly and
> immediately submit to police authority, courts must
> determine when and how the submission occurred.  <u>See,
> e.g.</u>, <u>United States v. Lender</u>, 985 F.2d 151, 153-55
> (4th Cir. 1993).  "[W]ithout actual submission" to the
> police, "there is at most an attempted seizure," which
> is not subject to Fourth Amendment protection. . . .
>
>                * * *
>
> <u>Hodari D.</u> established the broad principle that an
> individual must submit to authority for a seizure to
> occur; <u>Brendlin</u> teaches that "passive acquiescence" is
> one form of that submission.

. . . [D]etermining what constitutes "submission" can
be a difficult, fact-intensive inquiry.  "[W]hat may
amount to submission depends on what a person was
doing before the show of authority: a fleeing man is
not seized until he is physically overpowered, but one
sitting in a chair may submit to authority by not
getting up to run away."  Brendlin, 551 U.S. at 262,
127 S. Ct. 2400; see also LaFave, 4 Search & Seizure §
9.4(d) (observing that "lower courts will frequently
be confronted with difficult questions concerning
precisely when the requisite physical seizure or
submission to authority . . . occurs.").  If an
individual does submit to a show of police authority,
and police then discover evidence, the court must
assess whether either reasonable suspicion or probable
cause supported the seizure.  See Terry, 392 U.S. at
20-21, 88 S. Ct. 1868.

Stover at 996.

In the instant case, the court finds Fields did not submit

to police authority.  Deputy Lilly testified that Fields did not

comply with any of his requests, i.e., Fields did not move out

of the road and come towards Deputy Lilly nor did he tell Deputy

Lilly his name.  Indeed, defendant fled from Deputy Lilly almost

immediately after the initial contact.  Fields's actions up to

and including his flight are the very definition of non-

submission.  See, e.g., Stover, 808 F.3d at 1000 ("[W]e cannot

hold that walking away from police with a loaded gun in hand, in

contravention of police orders, constitutes submission to police

authority."); United States v. Valentine, 232 F.3d 350, 359 (3rd

Cir. 2000) ("Even if Valentine paused for a few minutes and gave

13

his name, he did not submit in any realistic sense to the officers' show of authority, and therefore there was no seizure until Officer Woodard grabbed him."); United States v. Lender, 985 F.2d 151, 155 (4th Cir. 1993) ("We do not believe, however, that Lender's momentary halt on the sidewalk with his back to the officers constituted a yielding to their authority. [. . .] Defendant asks us to characterize as capitulation conduct that is fully consistent with preparation to whirl and shoot the officers."); see also United States v. Turner, 684. F. App'x 816, 819 (11th Cir. 2017) ("The record does not reflect that any of the men ran or refused to comply, thus they submitted to the show of authority by police officers.").

Therefore, because the court finds that Deputy Lilly's initial interaction with the defendant was a "brief encounter," the motion to suppress must be denied and the firearm admitted into evidence.  Accordingly, the defendant's Motion to Suppress Evidence (ECF No. 18) is **denied**.

### B. The Interaction Between Deputy Lilly and Defendant Viewed as a Terry Stop

The defendant supported his Motion to Suppress Evidence upon his argument that there was not reasonable suspicion to constitute a lawful Terry stop.  See ECF No. 18.  Thus, although the court finds that Deputy Lilly and the defendant's initial

interaction was merely a brief encounter, not triggering the
protections of the 4th Amendment, the court finds it appropriate
to discuss how the circumstances nevertheless presented
reasonable suspicion to constitute a lawful Terry stop.

In its motion to suppress evidence of the pistol, the
defendant argues that the encounter was a Terry stop that must
be supported by reasonable suspicion. Defendant contends that
there was insufficient evidence to support a finding of
reasonable suspicion. The defendant relies primarily on cases
involving anonymous tipsters. The court finds, however, that
the defendant has inaccurately categorized the 911 caller as
"anonymous." If the caller was anonymous, a finding of
additional corroborating evidence would be required to satisfy a
finding of reasonable suspicion. See, e.g., Florida v. J.L.,
529 U.S. 266, 270 (2000).

The government made the following argument to support its
contention that reasonable suspicion supported Deputy Lilly's
stop of the defendant: the phone tip was not anonymous, the
caller gave his name to the dispatcher; the description provided
by the caller fit the appearance of the defendant and his
companion; Lilly personally knew the area in question to be a
high crime area known for illegal drug activity. Furthermore,

the government pointed out that the seizure of the gun did not

occur until after the defendant pulled out the gun and dropped

it; this occurred during the chase, not as a result of physical

contact by Lilly with the defendant.  See ECF No. 22.

As previously stated, a police officer may "stop and

briefly detain a person for investigatory purposes if the

officer has a reasonable suspicion supported by articulable

facts that criminal activity 'may be afoot.'"  Terry, 392 U.S.

at 30.  The Court determines the presence or absence of

reasonable suspicion in light of the totality of the

circumstances. United States v. Crittendon, 883 F.2d 326, 328

(4th Cir. 1989).  The legitimacy of an investigative stop thus

turns on what constitutes "reasonable suspicion," which the

Fourth Circuit has called "a commonsensical proposition. [. . .]

[properly] [c]rediting the practical experience of officers who

observe on a daily basis what transpires on the street." United

States v. Lender, 985 F.2d 151, 154 (4th Cir. 1993).

In Wardlow, 528 U.S. 119, the United States Supreme Court

held that evidence of unprovoked flight supports reasonable

suspicion for a Terry stop.  In Wardlow, the defendant fled upon

seeing a caravan of police vehicles converge on an area known

for drug trafficking.  Id. at 121.  The officers pursued and

caught the defendant, conducted a pat-down search and discovered a handgun.  Id.  The Supreme Court held that the trial court properly denied the motion to suppress the handgun.  Id.

"In cases where an informant's tip supplies part of the basis for reasonable suspicion, we must ensure that the tip possesses sufficient indicia of reliability." United States v. Perkins, 363 F.3d 317, 323 (4th Cir. 2004).  "Where the informant is known . . ., an officer can judge the credibility of the tipster firsthand and thus confirm whether the tip is sufficiently reliable to support reasonable suspicion."  Id.  However, "[w]here a tip is anonymous, it must be accompanied by some corroborative element that establishes the tip's reliability.  Id.

In United States v. Quarles, 330 F.3d 650 (4th Cir. 2003), an informant called 911 with information about possible illegal activity.  Although he remained on the line, the caller did not identify himself by name to the 911 operator or to the investigating officers until the end of the call, after the Terry stop in that case had been conducted.  Id. at 652.  The Quarles court held that the call was not anonymous, because "[r]egardless of when the caller gave his name, the caller did identify himself to the dispatcher...."  Id. at 655.  The caller

also "stayed on the 911 line ..., watching the defendant and providing the dispatcher with on-going information regarding the defendant and even witnessing the police approaching the defendant." Id. The caller also gave personal information which "provided sufficient information to the police that he could have been held accountable for his statements." Id. at 656. Thus, the Quarles court found that "there was sufficient information given to accurately identify the caller," which "lends support to his credibility and reliability." Id. at 655.

The Fourth Circuit's subsequent decision in United States v. Elston, 479 F.3d 314, 318 n. 2 (4th Cir. 2007), expanded upon the factors in Quarles. The Elston court noted that "factors that can indicate the reliability of anonymous information" include whether the call "discloses the basis of the informant's knowledge," whether "the informant indicates that her report is based on her contemporaneous personal observation of the call's subject," and whether the informant "disclos[es] information that would enable authorities to identify her if they deem it necessary to do so." Elston, 479 F.3d at 318.

Here, as previously stated, the 911 caller provided his name to the dispatcher; however, the dispatcher did not provide the caller's name to Deputy Lilly. Additionally, the dispatcher

18

did not tell Deputy Lilly that the subjects had weapons on them.

In light of Quarles, the fact that the 911 dispatcher did not give Deputy Lilly the informant's name does not per se categorize the phone call as anonymous.  See Quarles, 330 F.3d at 652.  Furthermore, factors outlined by the Elston court to establish reliability are present: (1) the informant contemporaneously detailed the location and the appearance of the subjects while on the phone with the 911 dispatcher; and (2) the informant gave his name and the 911 dispatcher knew that the call came "in from the Greenville Road area in the vicinity of 671."  Thus, the 911 caller "disclos[ed] information that would enable authorities to identify [him] if they deem it necessary to do so."  Elston, 479 F.3d at 318.

Thus, even though the court's decision to deny the defendant's motion to suppress (ECF NO. 18) stands on separate and independent grounds, the court concludes that the tip is "sufficiently reliable to support reasonable suspicion."  See, e.g., Perkins, 363 F.3d at 321.  Therefore, even if the encounter is viewed as a Terry stop, the motion to suppress must be denied.

### III.  Conclusion

Based on the foregoing, the defendant's motion to suppress (ECF No. 18) is **DENIED**.

The Clerk is directed to send a copy of this Memorandum Opinion and Order to counsel of record, to the United States Marshal for the Southern District of West Virginia, and to the Probation Office of this court.

**IT IS SO ORDERED** this 26th day of March, 2019.

**ENTER:**

David A. Faber
Senior United States District Judge